UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

NORTH CLACKAMAS COUNTY WATER
COMMISSION,

               Plaintiff,                                Case No. 3:13-cv-01441-ST

       v.                                     OPINION AND ORDER

SIEMENS WATER TECHNOLOGIES CORP.,
a Massachusetts corporation,

               Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, North Clackamas County Water Commission ("Water Commission"), is a joint

water supply partnership among three municipal entities that owns and operates a water

treatment plant. In late 2003, after issuing Requests for Proposals ("RFP"), the Water

Commission granted a contract to US Filter Wastewater Group to provide a low-pressure,

immersed membrane filtration system and associated services for $2,749,000. Defendant,

Siemens Water Technologies Corporation ("Siemens"), acquired the assets and liabilities of US

Filter Wastewater Group in 2004.

1 – OPINION AND ORDER

The membrane modules (bundles of filtration membranes that screen impurities) began breaking at an above-average rate in 2011, five years after installation of the system. In response, Siemens replaced the broken membranes with "improved technology" and modified the plant intake system, but the above-average breakage continued. The Water Commission alleges that the system is failing rapidly and must be replaced along with the plant's infrastructure that was originally modified to accommodate the custom Siemens system. Based on the design and installation of a defective water filtration system in the plant, the Water Commission alleges five claims against Siemens for breach of contract, breach of implied duty of good faith and fair dealing, negligence, unjust enrichment and breach of warranty.

The court has diversity jurisdiction over the Complaint pursuant to 28 USC § 1332. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Pursuant to FRCP 12(b)(6), Siemens has filed a Motion to Dismiss (docket #11) the claims for breach of the implied duty of good faith and fair dealing, negligence, and unjust enrichment in their entirety and to dismiss damages greater than 10% of the contract amount on the remaining claims for breach of contract, and breach of warranty. For the reasons that follow, Siemens's motion is granted in part and denied in part.

## **STANDARD**

In order to state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 8(a)(2). To meet this standard and "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 US 662, 678 (2009) (emphasis added), quoting *Bell Atl. Corp. v. Twombly*, 550 US 544, 555 (2007). A

plausible claim "does not require 'detailed factual allegations,'" but does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Labels and conclusions or a formulaic recitation of the elements of a claim will not do. *Twombly*, 550 US at 555. In evaluating a motion to dismiss, the court must accept the allegations of material fact as true and construe those allegations in the light most favorable to the non-moving party. *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F3d 777, 783 (9th Cir 2012).

## FINDINGS

### I.    Contractual Limitations on Damages

Siemens moves to dismiss the First and Fifth Claims for breach of contract and breach of warranty to the extent that they seek damages in excess of the liquidated damages clause in the contract. The parties agree that the contract includes the Water Commission's RFP, Siemens's proposal, and the amendment to the proposal made by letter agreement on January 7, 2004. At oral argument, Siemens conceded that both claims survive a FRCP 12(b)(6) motion to dismiss, but argued that the breach of contract claim should be construed as a breach of warranty claim with recovery capped at 10% of the contract amount pursuant to Section 4.21:

> 4.21    CONSEQUENTIAL DAMAGES/LIMITS OF LIABILITY
>
> A. The maximum amount of Contractor's liability in damages for breach of contract provisions related to time of performance or for breach or [*sic*] warranty shall be ten percent (10%) of the contract amount for the Total Membrane System.
> B. The maximum amount of Contractor's . . . liability in the aggregate . . . for any and all injuries, claims, losses, expenses or damages whatsoever arising out of or in any way related to Contractor's services, the project, the work or this agreement from any cause or causes whatsoever, including but not limited to the negligence, errors, omissions, strict liability, tort, breach of contract or breach or [*sic*] warranty (except for causes described in subsection A of this section which are subject to a separate, lower

limit) shall not exceed one hundred fifty percent (150%) of the
contract amount for the Total Membrane System.

Complaint, Ex. A, p. 41.

As an initial matter, the Water Commission argues it would be premature for the court to
limit damages prior to discovery. In support, it cites cases involving factual disputes as to how
damages should be calculated. *Aguilar v. Boulder Brands, Inc.*, 12CV01862 BTM BGS, 2013
WL 2481549, *6 (SD Cal June 10, 2013) ("The issue of the amount of damages Plaintiff can
prove is not appropriate for resolution on a motion to dismiss."); *PaineWebber Inc. v. Banyan
Corp.*, CV 99-1476 HA, 2000 WL 1132095, at *3 (D Or Mar. 3, 2000) ("This dispute
demonstrates that determining the proper measure of damages in this case is a highly factual
matter, dependent on PaineWebber's knowledge and actions that it took to cover the shortfall
related to Banyan's cancellation of the shares."). Here, in contrast, the parties do not dispute the
factual underpinnings of the damages calculation, but instead dispute how to interpret the
contract provision that limits damages.

The parties present conflicting interpretations of Section 4.21. Siemens argues that
subsection A unambiguously provides that all claims for breach of warranty are subject to a
damages limitation of 10% of the contract price, which is consistent with and reinforced by the
plain wording of subsection B. The Water Commission disagrees on the basis that the text is
ambiguous and argues that the 150% cap in subsection B applies to its claims.

Whether the terms of a contract are ambiguous is a question of law. In the absence of an
ambiguity, the court construes the words of a contract as a matter of law. *Yogman v. Parrott*,
325 Or 358, 361, 937 P2d 1019, 1021 (1997) (citations omitted). To determine whether a
contract is ambiguous, *Yogman* prescribes a three-step analysis. First the court considers the text
of the contractual provision at issue in the context of the contract as a whole. *Yogman*, 325 Or at

4 – OPINION AND ORDER

361-63, 937 P2d at 1021-22.  "The court must, if possible, construe the contract so as to give effect to all of its provisions."  *Williams v. RJ Reynolds Tobacco Co.*, 351 Or 368, 379, 271 P3d 103, 109 (2011) (citation omitted).  A contractual provision is ambiguous if its wording can, in context, reasonably be given more than one plausible interpretation.  *Id* (citation omitted).  If the provision is ambiguous, then the court may consider extrinsic evidence of the parties' intent. *Yogman*, 325 Or at 363, 937 P2d at 1022.  And if the ambiguity still persists, the court may employ maxims of construction.  *Id.*

This court concludes that Section 4.21 is ambiguous in its references to breaches of contract and warranty in both subsections A and B.  In subsection B, the clause "except for *causes described in subsection A* of this section" immediately follows the reference to "claims . . . from any cause or causes whatsoever, including  . . . breach of contract or breach or [sic] warranty."  Complaint, Ex. A, p. 41 (emphasis added).  However, the contract does not define the key phrase "causes described in subsection A."  Such "causes described in subsection A" could refer to the phrase "related to time of performance," but that phrase follows and modifies "breach of contract provisions."  It precedes and does not refer to or modify "breach or [sic] warranty."  Therefore, subsection A does not describe any "causes" for "breach or [*sic*] warranty."  On the other hand, subsection B also uses the term "cause" to refer to "breach of contract or breach or [*sic*] warranty."  Based on this reference, "cause" in subsection A could be construed as meaning all claims for breach of contract or warranty.

In sum, it is unclear from the text and context what "causes" for "breach of contract or breach or [*sic*] warranty" in subsection B are "subject to a separate, lower limit" in subsection A. Without guidance to resolve the ambiguity from the text and context, the court must consider extrinsic evidence of the parties' intent.  Any such evidence requires the parties to first engage in

the discovery process.  Thus, Siemens's motion to limit damages as to the First and Fifth Claims

is denied as premature.

In addition, the Water Commission argues that interpreting the contract as suggested by

Siemens fails the essential purpose of the contract.  However, because the court does not accept

Siemens's interpretation, it need not address this alternative argument.

## II.    <u>Negligence</u>

Siemens seeks dismissal of the Third Claim for negligence based on the economic loss

doctrine.  Under Oregon law, common law negligence claims can be "legally cognizable even

when there is a contractual relationship between the parties."  *Abraham v. T. Henry Constr., Inc.*,

350 Or 29, 37, 249 P3d 534, 538 (2011).  "Because tort liability is imposed by common law

negligence principles, that responsibility exists unless altered or eliminated by a contract or some

other source of law."  *Id* at 37-38, 249 P3d at 538.  "[W]e first consider whether plaintiffs

alleged that defendants unreasonably created a foreseeable risk of harm to a protected interest,

resulting in injury to plaintiffs.  If so, we must determine whether the contract between the

parties altered or eliminated defendants' common law duty to avoid harming plaintiffs."  *Id* at

37, 249 P3d at 538.

However, a negligence claim may not be premised solely on "causing a stranger's purely

economic loss without injuring his person or property.  For a plaintiff to recover in those

circumstances, the plaintiff would have to show some source of duty outside the common law of

negligence, such as a special relationship or status that imposed a duty on the defendant beyond

the common-law negligence standard."  *Harris v. Suniga*, 344 Or 301, 308, 180 P3d 12, 15-16

(2008) (citations and internal quotation marks omitted).  Thus, if a plaintiff alleges only

economic damages flowing from a defendant's negligence, a special relationship or statutory

standard of care is necessary.  The Water Commission argues its negligence claim survives because it alleges both the existence of the special relationship between the parties and property damage.  Either allegation is sufficient for avoiding dismissal based on the economic loss doctrine.

"The common element among each of these [special] relationships is that the relationship 'imposes obligations beyond the common law duty to exercise reasonable care to prevent foreseeable harm.'"  *Bixby v. KBR, Inc.*, 893 F Supp2d 1067, 1090 (D Or 2012), citing *Jones v. Emerald Pac. Homes, Inc.*, 188 Or App 471, 478, 71 P3d 574, 578 (2003).  "[T]he inquiry whether such a relationship exists is functional, not formal.  '[T]he crucial aspect of the relationship is not its name, but the roles that the parties assume in the particular interaction where the alleged tort and breach of contract occur.'"  *Jones*, 188 Or App at 478, 71 P3d at 579 (second alteration in original), quoting *Strader v. Grange Mut. Ins. Co.*, 179 Or App 329, 334, 39 P3d 903, 906 (2002).  "Another way to characterize the types of relationships in which a heightened duty of care exists is that the party who owes the duty has a *special responsibility* toward the other party."  *Conway v. Pac. Univ.*, 324 Or 231, 240, 924 P2d 818, 824 (1996).  However, "[t]he focus is not on the subject matter of the relationship, such as one party's financial future; nor is it on whether one party, in fact, relinquished control to the other.  The focus instead is on whether the *nature of the parties' relationship itself* allowed one party to exercise control in the first party's best interests.  *Bennett v. Farmers Ins. Co. of Or.*, 332 Or 138, 161, 26 P3d 785, 799 (2001) (emphasis in original).  "If a contract exists, then we may examine that contract to determine the type of relationship between the parties."  *Id* at 162, 26 P3d at 799-800.

The Water Commission argues that it had a special relationship with Siemens based on its delegation to Siemens to exercise independent judgment on its behalf in customizing the filtration system.  Although the Complaint does not allege this delegation, the Water Commission seeks leave to amend to allege such a delegation.  Based on the contract provisions cited by the Water Commission at oral argument, any such amendment would be futile.

"[P]arties to a contract are in a 'special relationship' imposing a heightened duty of care and thereby creating potential tort liability when one party delegates to the other the authority to make important decisions with the understanding that the authority is to be exercised on behalf of and for the benefit of the authorizer." *Jones*, 188 Or App at 477, 71 P3d at 574.  In that event, the party who is owed the duty effectively has "authorized the other to exercise independent judgment in his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party." *Bennett*, 332 Or at 161, 26 P3d at 799, citing *Conway*, 324 Or at 241, 924 P2d at 824.  The only evidence provided by the Water Commission of Siemen's independent judgment is its use of proprietary technology in the system's design.  Even then, the Water Commission retained control over the decision to incorporate proprietary technology.  The relevant portion of the contract provides:

> The OWNER will consider waiving certain shop drawing submittal requirements for certain Equipment components if 1) the Supplier notifies the OWNER that the Supplier considers the requested information to be proprietary or covered by a patent and 2) the OWNER determines that the requested information is not required for the proper installation, start-up, operation, troubleshooting and maintenance of the equipment.

Complaint, Ex. A, p. 57.

More importantly, as prescribed by the contract, Siemens did not make any independent decisions. The designated engineer, MWH Americas, Inc. ("MWH"), approved all of Siemens's plans. *Id* at 7 ("MWH Americas Inc. will serve as the Owner's Representative and Engineer for the Supplier's contract. . . . [and] as the Engineer for design and inspection services."). Both the Water Commission and MWH provided a final review of the data and drawing. *Id* at 55-56. In addition, Siemens guaranteed the "shop drawings," meaning that it agreed "that it will not make any changes to the membrane filtrations systems design details that may affect other equipment and materials not furnished by the Supplier following the ENGINEER's final review." *Id* at 57.

This relationship is distinguishable from those cases cited by the Water Commission. In *Eulrich v. Snap-On Tools Corp.*, 121 Or App 25, 853 P2d 1350 (1993), *judgment vacated on other grounds by* 512 US 1231 (1994), the Oregon Supreme Court found a manufacturer-dealer relationship to be special even though such a relationship generally does not create fiduciary duties. The relationship was distinguishable based on "evidence that defendants encouraged plaintiff to enter a relationship of dependence and reliance beyond that contemplated in a typical dealership." *Id*, 12 Or App at 37, 853 P2d at 1358. That evidence included:

> ongoing, intensive supervision in which the field manager rode along with plaintiff and actually conducted sales on behalf of plaintiff. Plaintiff's supervisor did all of his paperwork for the first month, and continued to do some of that paperwork throughout plaintiff's tenure as a dealer. Snap-On provided plaintiff with extensive funding and financing and encouraged plaintiff to use Snap-On's credit extending program, even though it was often plaintiff's credit that was being extended. There was also evidence that defendants promised to "take care of" their dealers and exercised complete control over how the business was run and over the size and location of the dealer's territory.

*Id* at 36, 853 P2d at 1358.

The Water Commission argues that it was similarly dependent on the engineering expertise of Siemens.  To the contrary, Siemens did not exercise the level of control over the engineering of the system that Snap-On Tools had over Eulrich's business.  While Siemens was responsible for the initial design, that design was subject to MWH's approval and even then, the Water Commission continued to have input.  The Water Commission's relationship with Siemens exemplifies a more typical service or goods contract in which the provider exercises independence over the development of its product or service, without that judgment infiltrating the recipient's business or controlling operations.

In contrast, in *Bixby v. KBR, Inc.*, 893 F Supp2d 1067 (D Or 2012), the United States government effectively turned over control of a water treatment plant to its contractor, KBR.  "The Army sought to restore Iraqi oil production by restoring damaged infrastructure such as the Qarmat Ali water treatment plant.  In order to achieve that goal, it entered into a contractual relationship with KBR, entrusting it to look after those interests as it performed the restoration work."  *Id* at 1091.  Its contract even "authorized KBR to 'exercise independent judgment,' on the Army's behalf."  *Id.*  Notwithstanding the glaring absence of a direct authorization of Siemens to exercise independent judgment, the contract did not define the design stage to be under Siemen's exclusive control.  The design of the filtration system upgrade was in fact a combined effort by Siemens and MWH.  Siemens was to design the membrane filtration system with approval, and MWH was then responsible for "complet[ing] the design of the overall water treatment facility, ancillary systems and equipment interfaces between the membrane filtration system and other existing and new equipment not furnished by the Supplier."  Complaint, Ex. A, p. 55.  The contract also required that "drawings shall show sufficient detail for the

ENGINEER/Installation Contractor to design, fabricate, support, anchor, and install piping not furnished by the Supplier." *Id* at 57.

Siemens did not have the autonomy given to the parties in *Bixby* and *Eulrich*. Without the control and heightened duty accompanying such responsibility, it can have no special relationship with the Water Commission. Thus, the Water Commission can only state a negligence claim if the alleged damage is not purely an economic loss.

Economic loss is defined by the Oregon Supreme Court as "financial loss such as indebtedness incurred and return of monies paid, as distinguished from damages for injury to person or property." *Onita Pac. Corp. v. Trs. of Bronson*, 315 Or 149, 159, 843 P2d 890, 896 (1992). The Oregon Court of Appeals has followed that lead in subsequent cases and "defined 'economic losses' to refer to financial losses to intangibles." *Harris v. Suniga*, 209 Or App 410, 418, 149 P3d 224, 227 (2006). "Unlike economic losses to third parties, which can be indeterminate and potentially unlimited, physical damage to property ordinarily can be ascertained, assessed, and paid." *Harris*, 344 Or at 312, 180 P3d at 18 (economic loss doctrine did not bar claim for dry rot damage caused by negligent construction).

The Water Commission alleges that it suffered property damage based on, among other things, "the related replacement costs, the waste of existing equipment and the retrofit of the Plant for a new filtration system." Complaint, ¶ 39. As it further explains, the necessary alteration of the plant's existing infrastructure to accommodate Siemens's system degraded the value of the plant once the system became inoperable. Those alterations were unique to the Siemens's design and will not accommodate any other system. Thus, the current plant is useless to the Water Commission without a retrofit or a fix for the Siemens's product.

On the spectrum created by the Oregon Supreme Court between damage to property and "purely economic losses," the damage alleged here is more akin to dry rot than to a lost investment. Recognized examples of "purely economic losses" are a reduced stock price and monetary gifts to a beneficiary. *Harris*, 344 Or at 310, 180 P3d at 17. However, here as in other cases involving physical damage that "can be ascertained, assessed, and paid," the concern for the "potentially limitless economic impacts of negligent conduct . . . is rarely present." *Harris*, 344 Or at 312, 180 P3d at 18; *see also Newman v. Tualatin Dev. Co.*, 287 Or 47, 50, 597 P2d 800, 802 (1979) (claim arose from deterioration of copper and galvanized pipe that were susceptible to degradation). The plant's "concrete . . . series of square water basins" (Complaint, ¶ 6) were physically altered to install the Siemens system. Without the Siemens's filtration system, the plant is effectively damaged. This constitutes tangible and current physical damage to the plant, and the cost to correct that damage can be easily assessed.

Thus, the Water Commission states a negligence claim that is not barred by the economic loss doctrine based on Siemens's alleged failure to exercise reasonable care to avoid foreseeable harm to the Water Commission's plant. That claim is not foreclosed by the contract because the terms of the contract do not purport to alter or eliminate Siemens's liability for the alleged damage to the plant. Accordingly, the motion to dismiss the negligence claim is denied.

III.   <u>**Unjust Enrichment**</u>

Siemens also seeks to dismiss the Fourth Claim for unjust enrichment on the basis that the Water Commission's damages can only flow from the written contract. Under Oregon law, unjust enrichment is a theory of "quasi-contract." *Summer Oaks Ltd. P'ship v. McGinley*, 183 Or App 645, 654, 55 P3d 1100, 1104 (2002). Quasi-contract "presupposes that no enforceable contract exists." *See Kashmir Corp. v. Patterson*, 43 Or App 45, 48, 602 P2d 294, 296 (1979).

Pleading alternative claims under theories of express and implied contract may be beneficial, for example,

> in the situation where it is faced with a contract which may be void under the statute of frauds, where its performance has been hindered by the defendant, where the facts at trial may show that it did not substantially perform the contract but that it is entitled to the reasonable value of the services furnished, or where the pleader is unsure of whether it can actually prove the existence of the contract at trial.

*Id* at 48, 602 P2d at 296 (citation omitted).

"When pleaded in the alternative, however, the two theories are mutually exclusive:  'It is well established that there cannot be a valid, legally enforceable contract and an implied contract covering the same conduct.'"  *Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.*, 203 Or App 768, 772, 126 P3d 1254, 1255-56 (2006) (citations omitted).

Siemens does not challenge the validity or enforceability of its contract with the Water Commission.  Thus, it is not appropriate for the Water Commission to plead alternative theories of breach of contract and unjust enrichment.  The Water Commission also argues that the implied contract covers conduct outside the written contract, such as the "rights and responsibilities arising from Siemens's inability to fix the filtration system."  To the contrary, any damage caused by an inoperable filtration system, regardless of whether caused by a defective membrane module, flows directly from the contract for the supply and delivery of a low-pressure, immersed membrane filtration system.

Finally, the Water Commission argues the claim arises from its special relationship with Siemens.  However, it cites no authority for this proposition, and as explained above, the relationship between Siemens and the Water Commission did not create implied duties.  Thus, the motion to dismiss the unjust enrichment claims is granted.

IV.    **Implied Duty of Good Faith and Fair Dealing**

Siemens seeks to dismiss the Water Commission's Second Claim for breach of the

implied duty of good faith and fair dealing.  Under Oregon law, every contract contains an

implied duty of good faith and fair dealing.  *Uptown Heights Assocs. Ltd. P'ship v. Seafirst*

*Corp.*, 320 Or 638, 645, 891 P2d 639, 643 (1995).  A duty of good faith and fair dealing,

however, "may be implied as to a disputed issue only if the parties have not agreed to an express

term that governs that issue."  *Oregon Univ. Sys. v. Oregon Pub. Emps. Union, Local 503*, 185

Or App 506, 511, 60 P3d 567, 569-70 (2002).  Thus, Siemens's breach of the duty of good faith

depends on whether the contract for the filtration system contains express provisions governing

all aspects of the alleged breach.

The Water Commission argues, as it did in defense of the unjust enrichment claim, that

this claim protects its rights in the event the entire system is irreparable.  However, because

Siemens's role in the retrofit was the design and installation of a membrane system, any liability

for the failure of the overall system would be the direct result of membrane performance.  The

contract specifically defines Siemens's responsibilities in terms of the membrane modules,

providing extensive and detailed parameters for identifying membrane failure.  Accordingly, ,

the contract governs Siemens's liability in the event of system failure.  Moreover, at oral

argument, the Water Commission conceded that it intended the claim for breach of the implied

duty of good faith and fair dealing as an alternative claim to breach of contract.  Because the

breach of contract and breach warranty claims survive the motion to dismiss, any alternative

claims are superfluous.  Thus, the motion to dismiss the claim for breach of the duty of good

faith is granted.

///

14 – OPINION AND ORDER

**<u>ORDER</u>**

For the reasons stated above, Siemens's Motion to Dismiss (docket #11) is GRANTED as to the Second Claim (breach of implied duty of good faith and fair dealing) and Fourth Claim (unjust enrichment), and otherwise DENIED.

DATED  January 14, 2014.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge